# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

JENNIFER JOHNSON,                              Civil No. 04-2766 (JRT/FLN)

                         Plaintiff,

v.                                            **MEMORANDUM OPINION
                                              AND ORDER ON DEFENDANT'S
                                              MOTION FOR
CAMPBELL MITHUN,                              SUMMARY JUDGMENT**

                         Defendant.

---

Chad W. Strathman and Jeremy D. Sosna, **STRATHMAN & SOSNA**, 10 South Fifth Street, Suite 700, Minneapolis, MN 55402, for plaintiff.

Daniel N. Lovejoy and Steven R. Anderson, **FAEGRE & BENSON LLP**, 90 South Seventh Street, Suite 2200, Minneapolis, MN 55402, for defendant.

Plaintiff Jennifer Johnson brought this action against her former employer, defendant Campbell Mithun ("CM"), asserting claims under the Family Medical Leave Act ("FMLA"), the Americans with Disabilities Act ("ADA"), the Minnesota Human Rights Act ("MHRA"), and common law invasion of privacy. Defendant moves for summary judgment on plaintiff's claims. For the reasons discussed below, the Court grants in part and denies in part defendant's motion.

## BACKGROUND

Defendant Campbell Mithun is an advertising business, specializing in print and television ads. In May 2001, Johnson became a Vice President and Creative Director of

the Packaged Foods Group at CM.  By all accounts, she was very good at her job, and well liked by colleagues and clients, including St. Ives and Betty Crocker.

In June 2002, Johnson was diagnosed with multiple sclerosis (MS).  She disclosed her diagnosis to her supervisor, Rick Gibson.  Her symptoms at the time of the diagnosis are somewhat disputed, but according to Johnson, she had problems with her vision, fatigued easily, had numbness in her leg, and experienced other common symptoms of the disease.  Johnson claims that her MS symptoms made it impossible for her to work, and on doctor's orders, she went on leave shortly after her diagnosis.

Johnson took FMLA leave beginning in June 2002.  At that time, she was extensively involved in a large commercial advertisement project for St. Ives.  Johnson discussed her leave with Gibson, and they agreed that because she was planning on returning in July, and because little work would need to be done on the St. Ives project in that timeframe, CM would not reassign any of Johnson's work.

At the end of June, while still on leave, Johnson attended an event with CM colleagues and St. Ives representatives in an effort to maintain client contact.  The event went well, and Johnson states that she does not believe that the St. Ives representatives were aware that she had a disability.  Johnson also claims that she did not want CM to tell anyone else about her diagnosis, and that she specifically told her CM colleagues at the event not to disclose her diagnosis.

In early July, Johnson realized that she was not yet able to return to work, as she had initially planned.  Gibson was anxious about Johnson's return because of the heavy workload, and so he reassigned her work, including the St. Ives project, to other people.

On July 23, Gibson sent an email to Johnson and other members of her group, including Christy Martin, Senior Vice President and Creative Director in the Packaged Goods Group, informing them that Johnson would be on leave until the end of August, and that Cathy Grisham, another CM employee but not a member of the Packaged Goods Group, would take over for her.  The email also stated that "assuming" Johnson returned as anticipated, Grisham would step back, and Johnson would resume work on the St. Ives project.

After this email was sent, another CM employee, Vanessa Mitchell, called a contact at St. Ives and informed the contact that Johnson had been diagnosed with MS and would be on leave until the end of August.  CM then sent a letter disclosing Johnson's MS to various other people at St. Ives, the market research team at Alberto Culver, and CM.  Although the exact number is disputed, roughly twelve to fifteen people saw or received the letter.

Johnson claims that she never authorized this disclosure, was not informed of the disclosure until after it had taken place, and was shocked and horrified that her medical information had been communicated to a client.

Johnson stayed in close contact with the team working on the St. Ives project during her leave, and through this contact learned in early August that St. Ives liked the draft commercial, and that shooting of the commercial would take place in Italy in September.  Around the same time, Gibson called Johnson and told her she was off the St. Ives project.  Although Johnson requested to stay on the project, Gibson refused, telling her that he wanted the new St. Ives team to be able to make decisions without her.

Grisham took over Johnson's work on the St. Ives project and moved into the Packaged Goods Group. Gibson reportedly told Grisham that he was concerned that Johnson would not be able to work on the commercial, because it would be a "grueling" 24/7 project, and because St. Ives was a particularly difficult client.

On September 3, 2002, Johnson returned to work at CM. All of her work had been reassigned, so she had only low-level work to do. Gibson told Johnson that he would get more work for her within a month. In his deposition, Gibson stated that he told Johnson to get enough rest, and that he would monitor her workload to make sure she was not overburdened. Gibson further stated that he wanted to "ease" her back in to work at CM, but acknowledged that Johnson did not ask to be eased back into work. Gibson did not allow Johnson to work at all on the St. Ives project, including post-production commercial work, or print ad work. Gibson also did not provide St. Ives with written notice that Johnson had returned. Finally, Johnson claims that during September and October, Gibson refused to put her on high-level projects for other clients, such as Betty Crocker, even though that work was available.

In October 2002, CM did the filming on the St. Ives commercial in Italy. Johnson asked to go on the trip, and other members of the St. Ives team wanted her to go, but Gibson refused, and sent Grisham instead. Grisham had conflicts with the St. Ives representatives during the shoot, and was ultimately taken off the project. One of the St. Ives representatives, Jim Gonedes, filmed a video tribute to Johnson at the end of the shooting in Italy, expressing appreciation for the work she had done, as well as sympathy and concern for her health. Johnson never worked on the St. Ives project again.

During the late summer or early fall of 2002, Gibson learned that he would have to lay off some employees.  He was given a total amount of salary that had to be cut from his department, but no other guidelines as to which employees to lay off.  This was the second or third round of lay-offs at CM.  Gibson ultimately decided to terminate Johnson. Gibson claims that he based his decision on "who was working on what" at that time, and whose lay-off would be the least "disruptive."  Gibson also claims that he selected Johnson for lay-off because of her relatively high salary and relatively low seniority. Gibson admits he did not consider whether it would be possible to reassign Johnson to another position within CM, although CM's written termination policy requires such consideration.  Johnson was laid off on October 23, 2002.

In summer 2003, Johnson called Gibson about returning to work at CM.  At that time, she was working for a different ad agency, but she missed CM and wanted to return.   During this time, Johnson had received calls from headhunters regarding positions in CM.   Gibson did not return Johnson's phone call.  Johnson also called Martin about retuning to CM.  Martin spoke with Gibson and told him that Johnson wanted to return to CM, but Gibson said it was not possible.  Martin conveyed Gibson's response to Johnson.  Later that summer, Gibson hired two Creative Directors for CM.

## ANALYSIS

## I.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate in the absence of any genuine issue of material fact, and when the moving party can demonstrate that it is entitled to judgment as a

matter of law.  Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  A court considering a motion for summary judgment must view all of the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from the facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. *See*, *e.g.*, *Anderson*, 477 U.S. at 256; *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995); *Ring v. Sears, Roebuck & Co.*, 250 F. Supp. 2d 1130, 1138 (D. Minn. 2003).

## II.    ADA

The ADA prohibits employers from taking an adverse employment action against any "qualified individual with a disability" because of that disability.   42 U.S.C. § 12112(a).    Courts apply the familiar burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) to claims under the ADA. *Fenney v. Dakota, Minnesota & E. R.R. Co.*, 327 F.3d 707, 711-12 (8th Cir. 2003). Under this framework, the plaintiff initially bears the burden of establishing each element of the prima facie case.  *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1134 (8th Cir. 1999) (en banc).  The second step of the analysis requires the employer to "rebut the presumption of discrimination by articulating a legitimate, non-discriminatory reason for

the adverse employment action." *Id.* at 1135.  The third step shifts the burden back to the employee to present sufficient evidence that a reasonable jury could conclude that her disability was a motivating factor in her termination.  *Ordahl v. Forward Tech. Indus., Inc.*, 301 F. Supp. 2d 1022, 1026-27 (D. Minn. 2004).

### A.     Prima Facie Case

To establish a prima facie case of disability discrimination, plaintiff must show that she (1) was "disabled" within the meaning of the ADA; (2) was qualified to perform the essential functions of the job, with or without reasonable accommodation; and (3) suffered an adverse employment action under circumstances giving rise to an inference of unlawful discrimination.  *Snow v. Ridgeview Med. Ctr.*, 128 F.3d 1201, 1206 (8th Cir. 1997).  As defendant does not dispute that Johnson was qualified to perform the essential functions of the job, the only issues at this stage are whether Johnson can show that she had a "disability" within the meaning of the ADA, and whether she suffered an adverse employment action giving rise to an inference of discrimination.

### 1.     "Disability"

Under the ADA, the term "disability" is defined as a physical or mental impairment that substantially limits one or more of the major life activities of such individual; having a record of such an impairment; or being regarded as having such an impairment.  42 U.S.C. § 12102.  A number of courts have held quite correctly that MS qualifies as a "disability" under the ADA.  *See*, *e.g.*, *Heimbach v. Riedman Corp.*, 175 F. Supp. 2d 1167, 1176, n.9 (D. Minn. 2001) (citing cases).

In this case, the record demonstrates that it is undisputed that Johnson was diagnosed with MS, that she informed Gibson of her diagnosis, and that she took FMLA leave because she was unable to work.  When she returned to work, Johnson informed CM that she was cleared to resume her old workload.  Viewing the facts in the light most favorable to the plaintiff, Johnson's workload was significantly less than it had been prior to her leave, she had only low-level work to do, and although there was high-level work available for clients with whom she had previously worked, she was not assigned to those projects.  Further, there is evidence, such as the video tribute, that Johnson's colleagues at CM and client contacts at St. Ives regarded Johnson as having a disability.  Finally, Gibson testified at his deposition that he did not want to overburden Johnson, and that he wanted to "ease" Johnson back into work because of her condition. [1]

The Court finds that this evidence, at the very least, presents a genuine issue of fact regarding whether Johnson suffered from a "disability" within the meaning of the ADA.

---

[1] The facts here distinguish the cases cited by CM in support of its argument that Johnson did not have a "disability" within the meaning of the ADA.  *Cf. Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876 (10th Cir. 1996)  (plaintiff was not diagnosed with MS until after she filed a charge of discrimination, and her behavior prior to the diagnosis was not indicative of any disability, let alone MS); *Sorensen v. Univ. of Utah Hosp.*, 1 F. Supp. 2d 1306 (D. Utah 1998) (plaintiff was unable to perform her old job and/or refused a reasonable accommodation); *Sutton v. United Air Lines, Inc.*, 130 F.3d 893 (10th Cir. 1997) (did not involve MS; rather, court considered whether airline pilots who needed corrective lenses had a "disability" within meaning of ADA).

### 2.      Adverse Employment Action

Defendant does not dispute that Johnson was terminated and not rehired.  Since termination of employment is an "adverse employment action," the Court finds that Johnson has met her burden of establishing a prima facie case of discrimination under the ADA.

### B.      Defendant's Legitimate Reason

CM asserts that it terminated Johnson as part of a round of lay-offs, and that Johnson in particular was selected because of her relatively high salary and low seniority.  This is a legitimate, nondiscriminatory reason for her termination.  CM has met its burden on this step.

### C.      Plaintiff's Ultimate Burden

In this final stage, Johnson must present sufficient evidence that a reasonable jury could conclude that her disability was a motivating factor in her termination.  One means of doing so would be to prove that the CM's asserted legitimate reason for the action was false, or merely a pretext.  *Ordahl*, 301 F. Supp. 2d at 1029.  Thus, evidence sufficient to demonstrate pretext under the traditional *McDonnell Douglas* analysis will also be sufficient under the modified version, even where evidence indicates that CM's asserted legitimate reason is at least partly true.  *Id.*  Evidence relevant to a finding of pretext might include the employer's treatment of the employee before and after the employee became disabled, or the application of the employer's general policy and practice to disabled employees.  *See id.*; *McDonnell Douglas*, 411 U.S. at 804.

Johnson has offered evidence showing that CM treated her differently after she returned from disability leave because she had MS. Her workload was substantially smaller and consisted of low-level work, even though higher-level work was available. Gibson's remarks that he wanted to "ease" her back into work could be viewed as evidence of his intent to deprive her of work because of her MS. Johnson has also offered evidence showing that there was a formal policy at CM to attempt to place employees who would be laid off in other jobs at CM, but that Gibson did not consider that option for Johnson. Further, Johnson has offered evidence showing that Gibson knew that she wished to return to CM, but that CM nonetheless hired other people.

Taking this evidence in the light most favorable to the plaintiff, as the Court must, Johnson has presented evidence sufficient to create a triable question as to whether the reasons presented by CM for her termination were a pretext for an unlawful discriminatory action, and to permit a reasonable jury to conclude that Johnson's disability was a motivating factor in her termination by CM. The Court therefore denies CM's motion for summary judgment on the ADA claims.

## III.    MHRA

The MHRA[2] largely parallels the ADA, with one exception. *Ordahl*, 301 F. Supp. 2d at 1029 (citing *Maziarka v. Mills Fleet Farm, Inc.*, 245 F.3d 675, 678 n.3 (8th Cir.

---

[2] Defendant contends that plaintiff's MHRA claims are time-barred. Under the MHRA, a party has 45 days to bring a lawsuit after receipt of notice that the commissioner has dismissed the charge. Minn. Stat. § 363A.33, subd. 1. Written notice is presumed to be received from the date of its service by mail. *Id.* The commissioner dismissed plaintiff's charge on Monday,

(Footnote continued on next page.)

2001)).   Under the MHRA, a person is considered disabled if she "(1) has a physical, sensory, or mental impairment which materially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment." Minn. Stat. § 363A.03, subd. 12.   A "material" limitation is different from and less stringent than the "substantial" limitation required by the ADA.   *Hoover v. Norwest Private Mortg. Banking*, 632 N.W.2d 534, 543 (Minn. 2001) (citing *Sigurdson v. Carl Bolander & Sons, Co.*, 532 N.W.2d 225, 228 & n.3 (Minn. 1995)). In light of the above conclusion that Johnson has met the more stringent federal standard, the Court also finds that Johnson has met her burden with respect to her MHRA claims and that summary judgment is therefore inappropriate at this time.

---

(Footnote continued.)

April 12, 2004.  Five days later would be Saturday, April 17.  Forty-five days from April 17, 2004, is June 1, 2004.  Plaintiff, however, did not serve her complaint until June 3, 2004.

At issue is the calculation of the five-day presumption of notice period.  Plaintiff argues that Minnesota Rule of Civil P. 6.01 applies to the five-day notice period, such that neither Saturday, April 17, nor Sunday, April 18 count towards the five-day period, and that her MHRA claims are therefore timely.  Although the Minnesota courts do not appear to have addressed this issue, other courts have applied Rule 6 to the five-day presumption.  *See*, *e.g.*, *Washington v. Foresman*, 148 F.R.D. 241, 244 (N.D. Ind. 1993) (applying Rule 6 of the Federal Rules of Civil Procedure to the five-day presumption).

The Court holds that Rule 6.01 applies to the five-day presumption, and accordingly plaintiff's MHRA claims are not time-barred.

**IV.    FMLA**

The FMLA allows eligible employees to take up to twelve weeks of unpaid leave for a serious health condition that makes the employee unable to perform the function of her job.  26 U.S.C. § 2612.  Employers may not "interfere" with or "deny" employees their rights under the FMLA.  Courts recognize two types of claims under the FMLA: "interference" claims and retaliatory discrimination claims.

**A.    Interference**

To establish an interference claim under the FMLA, an employee "need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied." *Carlsen v. Green Thumb, Inc.*, 2004 WL 234406 at * 6 (D. Minn. Feb. 4, 2004) (citing *Strickland v. Water Works & Sewer Bd.*, 239 F.3d 1199, 1206-07 (11th Cir. 2001)); *see also* 29 U.S.C. §§ 2612(a)(1)(D), 2615(a)(1); 29 C.F.R. § 825.220(b);  *Regan v. Natural Resources Group, Inc.*, 345 F. Supp. 2d 1000, 1010 (D. Minn. 2004) (quoting *Carlsen*).  Although an employer's intent is not relevant to an interference claim, courts have held that the FMLA does not impose strict liability on employers.  *Throneberry v. McGehee Desha County Hosp.*, 403 F.3d 972, 977 (8th Cir. 2005) (citing *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 960-61 (10th Cir. 2002; 29 C.F.R. § 825.216(a)).  Rather, "an employer who interferes with an employee's FMLA rights will not be liable if the employer can prove it would have made the same decision had the employee not exercised the employee's FMLA rights."  *Id.*  In that situation, the burden is on the employer to prove it would have made the same decision regardless of the

employee's assertion of FMLA rights.  *Id.* (holding that the District Court properly instructed the jury on that issue); *cf. Rice v. Sunrise Express, Inc.*, 209 F.3d 1008, 1018 (7th Cir. 2000) (holding that "the employee must ultimately convince the trier of fact, by a preponderance of the evidence, that . . . the benefit is one that the employee would have received if leave had not been taken"); *Pharakhone v. Nissan N. Am., Inc.*, 324 F.3d 405, 408 (6th Cir. 2003) ("If the employee cannot show that he was discharged because he took leave . . . he cannot show a violation of the FMLA").

Johnson argues that she has adduced sufficient evidence in support of her interference claim because she was not returned to an equivalent position after her leave, and was subsequently terminated.  "An equivalent position is one that is virtually identical to the employee's former position in terms of pay, benefits and working conditions, including privileges, perquisites and status. It must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority."  29 C.F.R. § 825.215(a); *Cooper v. Olin Corp.*, 246 F.3d 1083, 1091-92 (8th Cir. 2001) ("Accordingly, the restoration of salary, title, and benefits does not necessarily constitute restoration to the same position within the meaning of section 2614(a)(1)(A) when the job duties and essential functions of the newly assigned position are materially different from those of the employee's pre-leave position.").

It is undisputed that upon returning to work at CM, Johnson had substantially less work to do, and the work she had was very low-level.  Although defendant asserts that Johnson's lack of work upon her return to CM was part of the natural ebb and flow of the

business, Johnson has offered evidence showing that there was higher-level work available, notably for St. Ives and Betty Crocker, but that she was not given that work. Further, although Johnson was initially told that she would be restored to the St. Ives project upon her return from leave, her supervisor later decided against it.  Finally, Johnson was terminated approximately two months after her leave ended.  Viewing the facts in the light most favorable to Johnson, the Court holds that there are genuine issues of material fact on Johnson's FMLA interference claim.

### B.  Retaliatory Discrimination

The FMLA also prohibits employers from discriminating against employees for asserting rights under the Act. 29 U.S.C. § 2615(a)(2). This prohibition necessarily includes consideration of an employee's use of FMLA leave as a negative factor in an employment action.  *Darby v. Bratch*, 287 F.3d 673, 679 (8th Cir. 2002).  As with claims brought under the ADA, the *McDonnell Douglas* burden-shifting framework applies to FMLA retaliation claims.  *Id.*  To establish a prima facie case of FMLA retaliation, an employee must show that she engaged in activity protected under the Act, that she suffered an adverse employment action by the employer, and that there is a causal connection between the two.  *Id.*

As set forth above, Johnson has adduced evidence showing that her supervisor gave her low-level work after her FMLA leave because he had concerns about Johnson's medical condition, that she was terminated shortly thereafter, and that there was no attempt to find another position for Johnson within CM, in violation of CM's written

employment policy.  This evidence raises genuine issues of material fact on Johnson's FMLA retaliation claim, and summary judgment is therefore also inappropriate on this claim.

Johnson also alleges that CM engaged in retaliatory discrimination by refusing to re-hire her.  In the failure-to-hire context, plaintiff must allege that (1) she exercised FMLA rights; (2) she applied and was qualified for a job for which defendant was seeking applicants; (3) she was rejected; and (4) defendant sought applications from others.  *See Chambers v. Wynne Sch. Dist.*, 909 F.2d 1214, 1217 (8th Cir. 1990) (failure to re-hire in age discrimination case).

There is no dispute that Johnson exercised FMLA rights.  Defendant disputes that Johnson "applied" for a position with CM after she was laid off.  Courts have held that a plaintiff's failure to formally apply for a job opening will not necessarily bar the plaintiff from establishing a prima facie claim, "as long as the plaintiff made every reasonable effort to convey his interest in the job to the employer."  *Chambers*, 909 F.2d at 1217 (citing *EEOC v. Metal Serv. Co.*, 892 F.2d 341, 348 (3d Cir. 1990); *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 568 (8th Cir. 1982)).  In keeping with the Supreme Court's statement in *Burdine*, showing an application was made is ordinarily "a minimal obstacle."  *Fowle v. C & C Cola*, 868 F.2d 59, 67 (3d Cir. 1989) (*citing Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

Johnson does not argue that she formally applied, rather, she argues that she sought to apply for a job at CM, that she had reason to believe CM was hiring based on headhunters who had contacted her, that she called Gibson about being rehired but that he

did not return her call, and that two other CM employees, Martin and Imen Wozeny asked Gibson to bring Johnson back, but Gibson refused.  Johnson further alleges that based on the (lack of) response from Gibson, and based on Martin's statements, Johnson reasonably concluded that it would be futile for her to take any further steps to apply for a job at CM.  Finally, CM does not appear to claim that it had no knowledge that Johnson wanted to be re-hired, nor does it appear to claim that it  was following any hiring policy in failing to consider Johnson for the available Creative Director positions.

Based on these allegations, and in keeping with *Burdine's* statement that showing that an application was made should be a minimal obstacle, the Court holds that genuine issues of material fact exist regarding Johnson's failure to re-hire claim, and denies defendant's motion for summary judgment on this issue.

## IV.   INVASION OF PRIVACY

In *Lake v. Wal-Mart Stores, Inc.*, the Minnesota Supreme Court adopted three separate causes of action, which are generally referred to as the tort of invasion of privacy: intrusion of seclusion, appropriation of a name or likeness of another, and publication of private facts. 582 N.W.2d 231, 236 (Minn. 1998).  Johnson claims that defendant tortiously publicized the private fact of her MS diagnosis to a number of her former colleagues and client contacts.

To state a claim for publication of private facts, a plaintiff must demonstrate that one gives publicity to a matter concerning the private life of another, where the matter publicized is of a kind that would be highly offensive to a reasonable person, and is not of

legitimate concern to the public.  *Bodah v. Lakeville Motor Express, Inc.*, 663 N.W.2d 550, 553 (Minn. 2003) (citing *Lake*, 582 N.W.2d at 236); Restatement (Second) of Torts, § 652D)).  The Minnesota Supreme Court has adopted the Restatement's definition of "publicity," which means that "the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge."  *Id.* at 557.

In *Bodah*, the court concluded that, as a matter of law, the disclosure of 204 employees' social security numbers to sixteen terminal managers in six states did not constitute "publication."  *Id.* at 557-58; *see also C.L.D. v. Wal-Mart Stores, Inc.*, 79 F. Supp. 2d 1080, 1084 (D. Minn. 1999) (concluding that disclosure of private facts to a few employees did not constitute publication).

Here, as in *Bodah* and *C.L.D.*, there is no indication that plaintiff's MS was disclosed in the media or in "any other form accessible to the public at large." Accordingly, Johnson's claim for publication of private facts fails as a matter of law and is dismissed.

This case will be placed on the Court's next available trial calendar.

**ORDER**

Based on the foregoing, all the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that defendant's Motion for Summary Judgment [Docket No. 31] is **GRANTED IN PART** and **DENIED IN PART**. The motion is **GRANTED** with respect to Count IV-Invasion of Privacy and **DENIED** in all other respects.


DATED:    November 29, 2005
at Minneapolis, Minnesota.                    _____ s/ John R. Tunheim _____
                                                                JOHN R. TUNHEIM
                                                           United States District Judge